# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 9, 2012 Session

## IN RE AUSTIN D. ET AL.

### Appeal from the Circuit Court for Bradley County
#### No. V-10-424      J. Michael Sharp, Judge

---

### No. E2012-00579-COA-R3-PT-FILED-JANUARY 30, 2013

---

The trial court[1] terminated the parental rights of Nicole D. ("Mother") and Terry D. ("Father") to their minor children, Austin D. and Trinity D. (collectively "the Children"). Mother and Father separated after an incident of domestic violence; the Children remained with Mother. A drug raid at Mother's house led the Department of Children's Services ("DCS") to remove the Children and take them into temporary protective custody. DCS filed a petition seeking temporary legal custody. Later, the Children's maternal grandmother, Lisa D. V. ("Grandmother"), filed an intervening petition and was granted temporary custody. A year later, Grandmother filed a petition seeking to terminate both parents' parental rights; she seeks to adopt the Children. Following a bench trial, the court granted the petition based upon its findings, said to be made by clear and convincing evidence, that multiple grounds for termination exist and that termination is in the Children's best interest. Mother and Father appeal. We vacate in part and affirm in part. As to the trial court's decision that termination is appropriate, we affirm that ultimate conclusion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
### Vacated in Part and Affirmed in Part; Case Remanded

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J., and BEN H. CANTRELL, SR.J., joined.

Sarah E. Coleman, Cleveland, Tennessee, for the appellant, Nicole D.

Philip M. Jacobs, Cleveland, Tennessee, for the appellant, Terry D.

---

[1]When we use the words "trial court," we are referring to the Bradley County Circuit Court, from whence this appeal comes.

Matthew C. Rogers, Athens, Tennessee, for the appellee, Lisa D. V.

**OPINION**

I.

Austin and Trinity were born in February 2000 and August 2005, respectively. Mother and Father were married in 2007.[2] Trial on the petition to terminate was held over three days in September and October 2011. By that time, Austin, 11, and Trinity, 6, had been in Grandmother's custody for over two years. Grandmother, age 46,[3] was in good health; she wanted to raise the Children. We will summarize the proof at trial. In order to place the case and the issues before us in proper context, we begin with proceedings in the underlying juvenile court case and the facts leading up to those proceedings.

"Frustrations and problems" in the parties' marriage surfaced early. On August 8, 2008, the couple had an altercation at their home prompted by Father's accusation that Mother was having an affair and his belief that she was using drugs. Father said he and Mother went at each other "pretty good," and he "spun her around" in an effort to get her cell phone. Mother told the responding officer that Father "grabbed her by the hair and threw her on the bedroom floor." The officer noted "several red marks on [Mother's] back and a small knot on her head." Father was arrested for domestic violence. Both parties testified that this was the only physical confrontation they had ever had. As a result of the incident, the juvenile court issued an order of protection against Father; Father was ordered not to engage in or threaten to engage in domestic violence against Mother or the Children and to have no contact with Mother, direct or indirect, for a period of one year. Mother and Father separated.

Grandmother testified that she was always very involved in the Children's lives. For more than 20 years, however, she was self-employed as an over-the-road truck driver. She normally spent two weeks or more on the road, and then returned home for a few days, after which she again left to haul the next load. On September 2, 2008, Grandmother received a

---

[2]During these proceedings, Father's paternity of Austin was brought into question after it was shown that Mother was married to a Steven R. when Austin was conceived and born. Father was ordered to engage in DNA testing, the result of which revealed a 99.9997% probability that he is the biological father of the Children. Paternity is not an issue in this appeal.

[3]Grandmother testified that Mother was born in 1979, when Grandmother was 13 years old.

-2-

call from Mother asking her to pick up the Children from school and come to DCS's office.[4] When Grandmother arrived, Mother confessed that she had failed a drug test. By all accounts, Grandmother was unaware of Mother's drug use prior to that time. On this occasion, Mother tested positive for methamphetamine and she admitted to DCS staff that she had used illegal drugs within the past week. Grandmother, DCS staff, and Mother entered into an "Immediate Protection Agreement" and a "Non-Custodial Permanency Plan" by which Grandmother agreed to take temporary custody of the Children while Mother addressed her drug problem. Mother was permitted contact with the Children under the supervision of Grandmother. The agreement further provided that "before [Father] is allowed around the [C]hildren unsupervised he must enroll and actively participate in anger management."

All parties appeared at an October 2008 hearing in juvenile court to review the temporary custody order. The court essentially left the existing arrangements in place – Grandmother was granted temporary custody of the Children and Mother was permitted supervised visitation. Father, however, was denied any parenting time pending completion of an anger management course. After a trial home visit in November, custody was returned to Mother on December 2, 2008. Mother was ordered "to remain drug free and to provide a suitable environment for the [C]hildren." After the Children were returned to Mother, Grandmother rented a house for Mother and the Children and gave Mother money each week for rent and utilities. Despite this help, Mother was evicted a few months later for non-payment of rent. In January 2009, Grandmother allowed Mother and the Children to move into her home since Grandmother was on the road most of the time.

On March 6, 2009, officers with the Bradley County drug unit executed a search warrant at Mother's residence. Detective Jimmy Smith testified that, prior to that date, the unit had begun an investigation of Mother and her then-boyfriend, Scott V., after receiving reports of drugs being sold and methamphetamine being manufactured at Mother's home. For two weeks prior to the drug raid, controlled purchases of drugs were made in transactions involving both Mother and her boyfriend, some with the Children present. During the search, officers found bags of methamphetamine, pills, scales and other drug paraphernalia throughout the house. Detective Smith recalled that "[DCS] knocked on the door . . . in the middle of the search" although they had not been called by anyone present. Mother and Scott V. were later indicted on multiple drug-related charges. Father was not present or involved in the drug transactions or execution of the search warrant. At the trial on the termination issue, Grandmother noted that the house was a single-level, 850 square foot structure. She

---

[4]The record is not entirely clear, but it appears that, following the incident of domestic violence, Child Protective Services referred the family to DCS for further investigation.

was most disturbed that the drugs and related items were in easy reach of the Children.

DCS case manager, Amanda Kozak, was assigned to the case. In her affidavit of reasonable efforts, she noted that DCS received a referral concerning the Children on March 5, 2009. School officials reported that Austin had appeared at school for "several days in a row" wearing the same clothes and had "an odor about him." The case manager continued:

> There is concern that [Mother] is selling 'ice.' It is reported that [Mother] stays in her room all day with a man and that Trinity and Austin are left alone in the rest of the house. Trinity's hair and clothes were dirty, and her teeth were in need of dental care.

The following day, the case manager and officers arrived at Mother's home ten minutes after the drug unit came to execute the search warrant. The case manager continued:

> [A drug unit officer] stated that they found meth in [Mother's] purse, inside her wallet. He stated there was also meth in the boyfriend's pouch. He stated that [Mother] had pills in her purse, blue hydro pills, and fentanial patches . . . . [T]hey recovered about 15 grams of meth overall. He stated that they also have been selling guns. . . . He stated that they also found a diary with several drug buys and things [Mother] has done. The case manager observed the home to have no food . . . only a half empty bottle of mountain dew, some clabbered milk, ice . . . , an empty box of mashed potatoes on the counter. There were also some fast food bags. . . . There were no clean clothes for the [C]hildren.
>
> *     *     *
>
> The case manager spoke with Scott V.[]. . . . He stated that he has meth in the home and in the bedroom and it belongs to him. He stated that he just did meth before police showed up. . . . [Mother] stated that she would not fail a drug screen, but her attorney previously advised her not to do any drug screens for [DCS] so she was not going to submit to one. She stated that she did not know that Scott was involved in drugs.

Citing Mother's ongoing drug issues, DCS immediately took the Children into emergency protective custody. Because no available relative could be found, the Children

were placed in foster care.[5]  In its petition for temporary custody, DCS alleged that the Children were dependent and neglected and/or severely abused, that their safety was threatened, and that no less drastic option than removal was available.  On March 12, 2009, the juvenile court granted DCS's petition for temporary legal custody upon finding probable cause to believe that they were dependent and neglected.  It set the matter for a preliminary hearing.[6]

Days later, on March 18, 2009, Grandmother returned and, upon learning about the Children, hired an attorney and filed an intervening petition in juvenile court seeking temporary and permanent custody.  On April 9, 2009, the juvenile court allowed Grandmother to intervene.  The order expressly provided that "[DCS] is divested of custody of the subject [C]hildren and [Grandmother] is hereby granted custody. . . .  The state is hereby relieved of further responsibility in this matter."  Upon obtaining custody, Grandmother and the Children moved to a new home.  At the same time, Mother continued to incur drug charges.  On April 6, 2009, Mother was charged with possession of Schedule II narcotics and drug paraphernalia, and later, on April 22, she was charged with four drug-related offenses on a traffic stop.

On May 4, 2009, Grandmother filed separate petitions seeking child support from Mother and Father.  On May 8, 2009, Father moved the juvenile court to set aside the order granting Grandmother custody based on his assertion that he was not appointed counsel until after the hearing was held.  After a further hearing, the juvenile court left the custody order in place, but granted Father one hour of supervised visitation with Trinity each week; no visitation with Austin was ordered pending an assessment by and recommendation from Austin's counselors regarding visitation.  The juvenile court further provided that "[Father] should complete a course of anger management and receive a diploma evidencing satisfactory completion of said course." The record reflects that Father's domestic violence charge was dismissed.  In the termination proceeding, Father testified that he agreed in a "plea deal" to complete an anger management course.  In her May 2010 report, the Children's court-appointed special advocate stated that "[Father] was originally ordered to take anger management classes but now says he does not have to because the judge dismissed [the domestic violence charge]."

_____

[5]Grandmother testified that she was out of state on a delivery when the Children were removed.  It is not clear if DCS attempted to contact her at that time.

[6]The order provides, in relevant part, that "the preliminary hearing in this cause is set for March __, 2009, at 9:00 a.m. at Bradley County Juvenile Court."  The blank space was not filled in.

In the trial court, much of the testimony revolved around the parents' drug use. Mother and Father admitted to drug use during the '90s. Further, Mother admitted to using methamphetamine and marijuana "a few times," but denied any drug use since early 2009. Mother pleaded guilty to four charges including the felony sale and delivery of methamphetamine, transactions that led to the drug raid at her home. She received an effective eight-year sentence and was released to probation after serving 90 days in jail from July 26, 2009, through October 24, 2009. Mother testified that despite her guilty pleas, she committed none of the offenses. For his part, Father said that his drug use was limited to marijuana and that he had smoked it again "once or twice" since 2000. He conceded he pleaded guilty in 2004 to two drug possession charges. A hair follicle drug test administered to Father in December 2010 was negative for the presence of any illegal drug use. Mother was questioned regarding handwritten entries in notebooks she kept that included apparent references to drug use by her and Father dating back to 1997. In notations dated March 2011, Mother wrote that Father gave her "½ hydro" and "½ of dro" on different occasions, and another time, stated they got "pretty lit on wine and he smoked [one] with me. . . ." Mother acknowledged her writings, but denied they were true. Father likewise denied that he had supplied Mother any drugs. Mother denied using drugs since April 2009. Mother produced drug screens from March 2009 and December 2010 that were negative for amphetamines, marijuana and other substances. She agreed, however, that she had continued to use drugs after completing outpatient treatment in 2008 and had never taken other steps to address her addiction. Contrary to the testimony of other witnesses, Mother denied taking a substance designed to mask a positive drug test.

At the time of the proceeding in the trial court, Father had been working for Frucon Industrial Services as a carpenter for six weeks. For many years before, he was employed by various companies to set up newly purchased mobile homes and to handle repossessions. He said he was paid in cash. Father had not filed a tax return for over ten years and the IRS had taken out liens against him. Father presented a certificate indicating that he had completed an on-line anger management course the week before trial. He testified he did not take a course earlier, as ordered, because he could not afford to do so. He later said it was because he did not take the requirement seriously – he "put it on the back burner" and didn't think about it again. Father produced photographs of a three-bedroom house he had moved into a few months earlier. He testified he had a lease/purchase option agreement and had set up a bedroom for each of the Children. Father testified he loved Mother, wanted to work on their marriage, and would do "whatever the court ordered" to reunite their family. He could not say why he had never before considered marriage counseling. After her release from jail, Mother lived in motels paid for by Grandmother, with an aunt, and with J.B.S., her biological father, before Father allowed her to move into a room in his new home.

On May 21, 2010, Grandmother filed a petition to terminate both parents' rights and adopt the Children. Grandmother explained that she could no longer be away for weeks at a time and also care for the Children, so she had retired from the trucking business and changed careers. At the time of trial, she was working as a home health aide for 15 hours a week, and had started her own photography business. Together, the positions brought her an income of $2,000 – $3,000 a month. She testified that between trial dates, she had traveled to California to interview for a high-paying management position with her former contracted trucking employer, LandStar. Grandmother was single, but had been married five times, most recently over ten years earlier. She testified that she had no intention of getting married again. She had had a romantic relationship with John C., whom she described as her best friend and "life partner," some six years earlier, but both testified that their relationship was now platonic – they enjoyed hunting, fishing, and spending time together. He testified he regularly saw the Children while in Grandmother's company. At trial, Grandmother testified she no longer had a relationship with Mother. She was focused on raising the Children and wanted to adopt them.

The trial court questioned Austin in chambers. He testified that when the Children lived with their parents, Mother and Father drank alcohol "quite a bit," and often fought. He stated they "would get very violent, like cussing each other and calling each other bad names and punching each other." Austin said both would punch, but "[Mother] always ended up on the floor." He testified that his relationship with his parents was good until his sister was born, after which he no longer received any attention. He said his Father hurt his feelings by calling him names like "lard butt" and by doing things in front of Father's friends such as purposely spinning the tires on an all-terrain vehicle to sling mud all over Austin. When the Children later lived only with Mother, they bathed once a week and mostly ate fast food. Austin attributed his poor school performance in the past to a lack of help from Mother. Austin told the trial court that (1) he enjoyed school and Grandmother helped him with his homework, (2) he and Trinity had their own bedrooms at Grandmother's home, and (3) he had a lot of friends. He considered Grandmother's friend, John C., to be a father figure. Austin had taken down pictures of his parents and was not interested in seeing them again.

The court expressly found that "a great deal" of both Mother's and Father's testimony was "simply not credible." The court found that Mother's journal entries, particularly with reference to drug use by her and Father, were "compelling." Based on her writings and the testimony of other witnesses, the court found that Mother and Father continued to use drugs through 2011. J.B.S. testified that Mother lived with him for six weeks in May – June 2011. He said Mother slept a lot but never went out to look for a job. Further, he and Mother smoked marijuana together, and she supplied it when he ran out. The trial court further found that although Mother was able, she had chosen to work very little.

-7-

In an extensive, 31-page order, the trial court found, by clear and convincing evidence, that multiple grounds for termination existed. As to both Mother and Father, the trial court found abandonment by willful failure to provide child support as well as persistent conditions. In addition, the court found that Mother had committed severe child abuse. The court further found, also by clear and convincing evidence, that termination was in the best interest of the Children. Accordingly, the trial court granted the petition to terminate, thereby making the Children available for adoption. Mother and Father, represented by separate counsel, each timely filed a notice of appeal.

II.

In their separate briefs, Mother and Father raise essentially the same two issues:

> 1. Is termination of a parent's rights to his/her children appropriate when DCS failed to consider placement with a parent or engage in reunification efforts with a parent?
>
> 2. Did the trial court properly weigh the evidence and err in terminating Mother's and Father's rights to the Children?

III.

We employ the following standard of review in cases involving the termination of parental rights:

> [T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551

(1972); ***In re Drinnon***, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See* ***Blair v. Badenhope***, 77 S.W.3d 137, 141 (Tenn. 2002).

This Court has observed:

> In order to terminate a parent's rights to his or her child, the trial court must make two findings. The court first must find . . . by clear and convincing evidence, that one of the asserted grounds for termination has been established. *See* Tenn. Code Ann. § 36-1-113(c)(1) (Supp. 1998). Once the court has made this finding, the court additionally must find that termination of the parent's rights is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2) (Supp. 1998).

***In re C.W.W.***, 37 S.W.3d 467, 475-76, (Tenn. Ct. App. 2000). Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, ***State v. Demarr***, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. ***In re Valentine***, 79 S.W.3d at 546; ***In re S.M.***, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

IV.

In the present case, the trial court terminated parental rights pursuant to Tenn. Code Ann. § 36-1-113 (g)(1),(3),(4)(Supp. 2012). These statutory provisions provide as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

*   *   *

-9-

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

(4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition. . . ;

As relevant to the present case, Tenn. Code Ann. § 36-1-102 (2010), referenced in subsection (g)(1) above, provides for the termination of parental rights on the ground of abandonment as follows:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

\* \* \*

(I) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or

-10-

adoption, that the parent(s) or guardian(s) . . . have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

* * *

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child . . . .

*See* Tenn. Code Ann. § 36-1-102(1)(A)(i)(D). For the purpose of establishing abandonment, the relevant four-month period in this case is January 21, 2010, through May 21, 2010, the latter date being the date on which the petition to terminate was filed.

As relevant in the present case, "severe child abuse," referenced in Tenn. Code Ann.§ 36-1-113 (g)(4) above, means the "knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death. . . ." Tenn. Code Ann. § 37-1-102(23)(A)(I). It includes "[k]nowingly allowing a child to be present within a structure where the act of creating methamphetamine . . . is occurring. . . ." Tenn. Code Ann. § 37-1-102(23)(D).

V.

Mother and Father both assert that the termination of *Father's* parental rights is not appropriate in the present case because DCS failed to engage in any efforts toward reunifying the family or placing the Children *with Father* before termination was pursued. They summarize their position as follows:

It is undisputed that DCS did not meet with Father, did not include him in any permanency plan, and made no efforts to assist him in reuniting with the [C]hildren. Father was not living with Mother and the [C]hildren[] when the [C]hildren were removed from the home. He was not part of the conditions causing the [C]hildren's removal and no effort was made to assist him in re-establishing his relationship with the [C]hildren.

-11-

The gist of the parents' position is that "DCS may have followed guidelines with respect to Mother's rights," but did not consider Father's rights before termination proceedings started. Father adds that "when [Grandmother] decided she wanted to adopt the [C]hildren, he . . . was left out of the system by [DCS] and no efforts were made to reunite or reunify him with his [C]hildren."

To be sure, when DCS separates Children from their parents and takes them into its custody, it has specific and continuing obligations toward the family. This Court has observed the central role of DCS in such cases:

> The Department of Children's Services is the state agency with primary responsibility for the care and protection of dependent and neglected children. It plays a direct role in the removal of most dependent and neglected children from their parents' custody, and Tennessee's juvenile courts regularly place these children in the Department's custody. Because of the prominent role that the Department plays in the lives of so many dependent and neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home. Tenn. Code Ann. § 37-1-166.

*In re Tiffany B*., 228 S.W.3d 148, 157 (Tenn. Ct. App. 2007). Moreover, the Tennessee Supreme Court has observed that the "Department's obligation to provide reasonable efforts to reunify a family arises when it first separates the child from his or her parents." *In re Bernard T*., 319 S.W.3d 586, 600 (Tenn. 2010). From that point, DCS is charged with acting to "preserve, repair, and reunite" the family. "Once children are removed, the first priority should be to reunite the family if at all possible." *In re Randall B., Jr.*, M2006-00055-COA-R3-PT, 2006 WL 2792158, at *4 (Tenn. Ct. App. M.S., filed Sept. 28, 2006). The Supreme Court has further spoken to DCS's continuing obligation to work toward reuniting the Children in their custody with their parents as follows:

> The Department's statutory obligation to use reasonable efforts to reunite children and their parents plays an important role in termination proceedings under Tenn. Code Ann. § 36-1-113. The Department may delay commencing a termination proceeding if it decides that it has not had sufficient opportunity to use reasonable efforts to provide the services needed to safely reunify the child with his or her parents. Tenn. Code Ann. §

-12-

36-1-113(h)(2)(C). By the same token, once the Department commences a termination proceeding under Tenn. Code Ann. § 36-1-113, it may be required to demonstrate that it has used reasonable efforts to reunify the family before a court will grant its termination petition.

*In re Bernard T.,* 319 S.W.3d at 600. More particularly stated, in a termination case,

> the law does not permit the Department to be passive when it removes children from their parents' custody. The law requires the Department to bring its skills, experience, and resources to bear in a reasonable way to bring about the reunification of the family.

*In re Tiffany B*., 228 S.W.3d at 160.

In May 2010, Grandmother, as the prospective adoptive parent, certainly had standing to pursue the termination of Mother's and Father's rights to the Children. *See* Tenn. Code Ann. § 36-1-113(b)(1). We find no authority, however, for the parties' position that, in the present case, DCS had an obligation toward them before the trial court could act upon Grandmother's petition. The Children were in Grandmother's custody, not DCS's, for more than a year when Grandmother, not DCS, initiated termination proceedings. As a result, DCS had no involvement at that juncture. In summary, Mother's and Father's argument that DCS was somehow obligated but failed to exert reasonable efforts to assist them in achieving reunification of the Children with Father must fail.

To the extent that the parents challenge DCS's actions – or inaction – in the underlying juvenile court proceedings, their argument also fails. As we have noted, DCS removed the Children from Mother's custody following the drug raid at her house. At that point, the juvenile court was required to determine whether the Children should be committed to the custody of DCS or could remain in their home. Tenn. Code Ann. § 37-1-166(a)(1)(2)(2010) provides as follows:

> At any proceeding of a juvenile court, prior to ordering a child committed to or retained within the custody of the department of children's services, the court shall first determine whether reasonable efforts have been made to:
>
> Prevent the need for removal of the child from such child's family; or

-13-

Make it possible for the child to return home.

As we earlier noted, in support of its petition for temporary custody, DCS alleged that the Children were dependent and neglected and/or severely abused in Mother's custody. In its affidavit of reasonable efforts, DCS asserted that in view of the rampant drug activity and the living conditions in the home, reasonable efforts were not required to prevent removal of the Children because of the imminent threat of harm to their safety, and that there was no less drastic option available. The juvenile court agreed. It granted DCS temporary legal custody of the Children upon finding probable cause to believe that they were dependent and neglected, and thereafter set the matter for a preliminary hearing. Unable to immediately locate a suitable relative, the Children were placed in foster care. Days later, Grandmother filed an intervening petition seeking temporary and permanent custody. The juvenile court allowed Grandmother to intervene and its order expressly provided that "[DCS] is divested of custody of the subject [C]hildren and [Grandmother] is hereby granted custody. . . . The state is hereby relieved of further responsibility in this matter."

Had the Children remained in its custody, certainly further action by DCS was mandated. For example, DCS is responsible for preparing a permanency plan "for each child in its foster care" within thirty days of foster care placement. Permanency plans shall include a stated goal plan of return to parent, placement with a "fit and willing" relative, or adoption. Tenn. Code Ann. § 37-2-403(a)(10(A)(i-iii)(2010). Further, the "permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency" in working toward the plan's goals. *Id.*

As should be readily evident, DCS's obligations to develop a permanency plan, to provide necessary services and assistance to the family and to exercise reasonable efforts in reuniting the Children with a parent or parents, if at all possible, were never triggered in the case at bar. The Children were in DCS's custody in foster care, in DCS custody, for a matter of weeks before the juvenile court vested custody in Grandmother, where they remained, without further DCS involvement, up to and including when she pursued termination a year later. Mother and Father are entitled to no relief on this issue.

VI.

A.

Both parents challenge the trial court's conclusion that clear and convincing evidence was shown to support each of the grounds for termination. We address the relied-upon grounds in turn, mindful that "[t]he existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights." ***In re***

*C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000)(*abrogated on other grounds*, *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005)).

B.

The trial court found that both parents abandoned the Children by willfully failing to provide child support. Mother and Father were each ordered pursuant to the Child Support Guidelines to pay child support of $479 per month, plus their respective arrearage at $21 per month, beginning on October 1, 2009, and November 1, 2009, respectively. Neither parent made any payments in 2009 through January 2010. As to Father, the court stated:

> [Father] has not remained current on his support, and has carried substantial arrearages. [Father] testified at trial that he has made efforts to make payments toward his support obligation in spite of his lack of ability to visit with his [C]hildren. However, the court finds that the first payment that [Father] made . . . was on March 2, 2010 for $220.00, followed by successive payments in March 2010 that amounted to the sum of $1,100. No other payment was made by [Father] until June 7, 2010; which was one month after [Grandmother] filed her Petition to Terminate. The court finds that there is clear and convincing evidence that [Father] has *willfully* failed to pay support. While he did pay some payments during the four months preceding the filing of the Petition, the courts finds by clear and convincing evidence that his payments and his payment history have not been reasonable under the circumstances.

(Emphasis in original.)

The trial court accurately summarized Father's payment history. During the critical four-month period, he paid nothing in January or February, 2010. In March 2010, Father was $3,353 in arrears when the court found him in willful contempt. Father was ordered to pay support as ordered and to pay $519 by the end of the month or attachment would issue. That month, Father made his first payment followed by several more totaling $1,100. In April, he again paid nothing. By the time of trial, Father's arrearage had grown to more than $7,000.

As to Mother, the court found:

[Mother's] payment of child support is found to be only token support. The court finds that she has willfully failed to pay child support and has willfully failed to make reasonable payments toward support. She willfully failed to maintain gainful employment when she was fully able and capable of being employed. She made the choice to be unemployed and therefore she made the choice not to be in a position to pay her child support obligation. Her long history of unemployment is the direct result of her personal choices, and not because of any inability to work. She has willfully chosen not to work and therefore not to pay her child support.

Mother made her first payment, $39, in February 2010. During the critical four-month period, she paid total child support of approximately $150, none during January and none during May 2010 when the petition was filed. In all, Mother paid approximately $1,776 by the time of trial. In January 2010, the juvenile court entered a $2,395 judgment against Mother representing the amount of her child support arrearage at that time. Mother was ordered to provide proof of employment within 30 days. Two months later, the court found that Mother had obtained, but then lost, her employment and was further in arrears. Mother subsequently spent 16 days in jail for failure to pay child support. By the time of trial, Mother owed more than $11,000.

At trial, Mother attributed her failure to satisfy her child support obligation to her inability to find and maintain stable employment. As to her employment history, Grandmother arranged for Mother to work as her dispatcher and bookkeeper for her trucking business in 2008. The job did not last because, according to Grandmother, Mother never did the required tasks and she ended up having to do the work herself. Mother also worked briefly through a temporary employment service in 2009. Mother testified she had been looking for work since the Children were removed and had found and lost several jobs. In 2010-2011, she worked at a dry cleaners and a photography business, each for three to four months before being terminated because she was "no longer needed." She attributed losing the latter job to sabotage by Grandmother. The extent of her "proof" of this claim was Mother's testimony at trial that she later learned from a former co-worker that "someone had called" and advised her employer that she was a drug addict and a thief.

There was little other explanation of the large gaps in Mother's work history or details regarding her efforts to find other employment. J.B.S. testified that Mother lived with him for some six weeks in the Spring of 2011. According to him, Mother slept a lot, but never tried to go out and find a job. Instead, Mother spent time smoking marijuana with him. At trial, Mother testified, without corroboration, that she was newly employed at Waffle House

-16-

and set to begin work. Mother agreed that before she sought permanent custody of the Children, Grandmother had believed in her and supported her and the Children and given Mother every opportunity to resolve her problems so she and the Children could be reunited.

On our review, we agree with the trial court's conclusion that Mother was, by all indications, able, but unwilling, to find and keep a job in order to help support the Children. In light of the evidence, we further agree that Mother's payment of a total of $150 in support of two children during a four-month period can only be considered "token" in nature. For his part, Father had worked consistently and testified that he was able to meet his expenses. Questioned why he finally began paying support in March 2010, Father replied, "[t]hey're my kids. They're my responsibility." It does not go unnoticed, however, that Father was by then in contempt for paying nothing at all since being ordered to begin providing support some five months earlier and risked going to jail if he failed to pay as ordered. "Failure to . . . support a child is 'willful' when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S*., 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005).

The record reflects that during 2010, Mother and Father began paying support most months, albeit usually well short of the required amounts. Unfortunately, this does not alter the fact of their willful failure to meet their support obligation in the four months prior to the filing of the termination petition. Their somewhat improved efforts notwithstanding, at the time of trial, Mother was behind in her support obligation nearly $12,000, while Father was $7,669 in arrears. In summary, the evidence does not preponderate against the trial court's finding that both Mother and Father abandoned the Children by their willful failure to provide child support. The trial court properly terminated the parental rights of Mother and Father on this ground.

C.

The trial court also terminated both parents' rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3), the ground commonly referred to as "persistent conditions." As to Mother, the trial court found that the conditions that led to the Children's removal from her home – primarily, her drug use – persisted at the time of trial and had never been successfully addressed. In Father's case, the court found that the anger management issue that prevented DCS from even considering Father as a placement option when the Children were taken from Mother's custody, plus other issues, were not resolved at the time of trial. In particular, the trial court found that Father's completion of an on-line anger management class the week before trial began – and two years after it was first ordered – was essentially "too little, too late," in that it "does not demonstrate that he has successfully remediated the issues that led to the Children being removed from his custody." Mother and Father challenge the trial

court's finding that clear and convincing evidence exists to establish the ground of persistent conditions. As will be discussed shortly, we conclude that Tenn. Code Ann. § 36-1-113(g)(3) is not available as a ground for termination in the present case.

This Court has held, "based on the statutory text and its historical development, that Tenn. Code Ann. § 36-1-113(g)(3) applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S*., 182 S.W.2d 838, 874 (Tenn. Ct. App. 2005). *See also*, *In re Arteria H*., 326 S.W.3d at 177. In *Audrey S*., we concluded that the trial court erred in terminating the mother's rights based on its finding of persistent conditions. We quote extensively from our analysis of the facts therein:

> [W]e must now determine whether the March 28, 1996 order removing Audrey S. from Jamie F.'s custody and the March 30, 2001 order removing Victoria L. from Jamie F.'s custody were based on judicial findings of dependency, neglect, or abuse.
>
> The March 28, 1996 temporary custody order and preceding restraining order were entered in a dependency and neglect proceeding, but they were not based on a judicial finding that Audrey S. was dependent, neglected, or abused. The statutes and rules governing procedure in the juvenile courts provide for three types of hearings in cases where a child is alleged to be dependent, neglected, or abused: (1) preliminary hearings; (2) adjudicatory hearings; and (3) dispositional hearings. The function of the adjudicatory hearing is to determine whether the allegations of dependency, neglect, or abuse are true. The . . . juvenile court's finding that a child is dependent, neglected, or abused must be based on clear and convincing evidence. . . . The purpose of the dispositional hearing, which follows the adjudicatory hearing, is to determine the proper placement for a child who has been found to be dependent, neglected, or abused.
>
> As its name implies, a preliminary hearing occurs prior to both the adjudicatory hearing and the dispositional hearing. Its function is to allow the juvenile court to decide whether the child should be removed from the parent's custody pending the adjudicatory hearing. The juvenile court is allowed to consider reliable hearsay in making its decision, . . . and it can order the

-18-

child removed from the parent's custody based on a finding of 'probable cause' that the child is a dependent, neglected, or abused child. . . .

The March 28, 1996 temporary custody order resulted from a preliminary hearing, not an adjudicatory hearing, and the restraining order was designed merely to preserve the status quo in advance of the preliminary hearing. The temporary custody order contains an implicit judicial finding of probable cause that Audrey S. was dependent, neglected, or abused. It does not contain a finding, either explicit or implicit, that Audrey S. was in fact dependent, neglected, or abused. The juvenile court never held an adjudicatory hearing on Wilma S.'s petition for temporary custody of Audrey S., and there is no other court order in the record prior to the filing of the joint termination petition that reflects a finding of dependency, neglect, or abuse with respect to Audrey S. Accordingly, the juvenile court erred in relying on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Jamie F.'s parental rights to Audrey S.

The March 30, 2001 restraining order that prevented Jamie F. from removing Victoria L. from Justin L.'s custody was entered on the basis of Justin L.'s verified petition for a change of custody. Justin L. did not claim that Victoria L. was dependent, neglected, or abused, and the petition did not refer to the statutes or rules governing dependency and neglect proceedings. Instead, Justin L. alleged that Victoria L. was currently residing with him, that Jamie F. denied him visitation with Victoria L. when the child was in her custody, that Jamie F.'s living arrangements and employment had become unstable during the preceding months, and that she had failed to care for Victoria L. properly. Justin L. argued that these facts amounted to a material change in circumstances, and that it would be in the best interests of Victoria L. if he was awarded custody of her.

The juvenile court's March 30, 2001 restraining order does not contain an explicit or implicit finding that Victoria L. was dependent, neglected, or abused. The obvious purpose of this order was to maintain the status quo pending further proceedings. The juvenile court entered several orders

-19-

continuing Justin L.'s custody of Victoria L. in the months leading up the hearing on his change of custody petition, none of which were based on a judicial finding of dependency, neglect, or abuse. The juvenile court's October 17, 2001 order granting Justin L.'s petition contains no express judicial finding of dependency, neglect, or abuse, and an order changing custody of a minor child does not necessarily imply such a finding. Accordingly, the juvenile court erred in relying on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Jamie F.'s parental rights to Victoria L.

*Id*. at 874-76 (internal citations omitted).

In the present case, there is no judicial finding that the Children were dependent, neglected, or abused in the record before us. Following the drug raid, DCS filed a petition for temporary legal custody together with an ex parte protective custody order. On March 12, 2009, the trial court entered the order granting DCS temporary custody based on its finding of "probable cause to believe that the [Children] are dependent and neglected. . . ." The order provided for a preliminary hearing, but no specific date was set. The record contains no further filings or orders to indicate that a preliminary hearing, much less an adjudicatory or dispositional hearing, was ever held. As to the first time that Grandmother obtained custody, in September 2008, her petition alleged that the Children were dependent and neglected. In its September 19 order, however, the juvenile court granted Grandmother temporary custody, "it appearing . . . from the sworn petition and the entire record that it is in the best interest of the [C]hildren. . . ."

In summary, nothing in the record before us shows, explicitly or by clear implication, that the Children were at any point found by a court to be dependent, neglected, or abused. As in *In re Audrey S.*, the court's ex parte "probable cause" finding in the present case, with a preliminary hearing to follow, certainly is not the clear and convincing evidence required. Accordingly, we conclude that the trial court erred in terminating both parents' rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3) absent a judicial finding that the Children in the present case were dependent, neglected, or abused.

Lastly, this Court has observed that the "purpose behind the 'persistence of conditions' ground for terminating parental rights is 'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Arteria H*., 326 S.W.3d at 178(citing *In re A.R.* No. W2008-00558-COA-R3-PT, 2008 WL 4613576 at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL

588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)). Thus, "[t]ermination on the ground of persistence of conditions implicates DCS' obligation to demonstrate that it made reasonable efforts to reunite the child with the parent." *Id*. at 179 (citing *In Re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, n.27 (Tenn. Ct. App. March 9, 2004)). Again, in the present case, neither foster care nor DCS's obligation of reasonable efforts was in play in the proceeding to terminate Mother's and Father's parental rights.

Based on the foregoing, we conclude that termination pursuant to Tenn. Code Ann. § 36-1-113(g)(3) was not made out. Accordingly, we hereby vacate the finding of persistent conditions as a ground for termination against Mother and Father.

D.

The trial court also terminated Mother's rights based on its finding that she committed severe child abuse related to her drug activity. The court stated:

> [The definition of severe child abuse in Tenn. Code Ann. § 37-1-102] states as follows: "The *knowing* exposure of a child to or the *knowing failure to protect* a child from abuse or neglect that is likely to cause serious bodily injury or death [. . . . ]. The statute further defines another category of severe child abuse as follows: "Knowingly allowing a child to be present within a structure where the act of creating methamphetamine [. . .] is occurring."
>
> *   *   *
>
> The court finds that there is clear and convincing evidence that [Mother] knowingly allowed both [C]hildren to be present within her house where methamphetamine was being created and sold. Her actions exposed both children to abuse and/or neglect that was likely to cause serious bodily injury or death.

(Emphasis in original.)

Mother asserts that there was no evidence to support a finding that she committed severe child abuse. She notes that she was not convicted of manufacturing methamphetamine incident to the drug raid of her home and that the "criminal investigation found no trace of a methamphetamine lab on the property." She concludes that the trial court inappropriately relied only on the testimony of Austin in support of this ground and

-21-

complains that "the court found this [testimony] credible despite the fact that the [C]hild would not have been able to see what activity was going on at night." At trial, the extent of Austin's testimony concerning some "unusual" activity by Mother and her boyfriend was as follows:

> They would have certain substances that I couldn't tell, because they would go outside and do it. I could see it outside my window. They would be mixing things in a coke bottle, and other times, she would have oddly smelling cigarettes that would smell like sour.

Earlier in its findings, the trial court reiterated that undercover drugs buys were made from Mr. V. and Mother prior to the drug raid and that drugs and paraphernalia were seized during the search. The court continued: "The testimony of the [C]hild, Austin [D.], corroborated the fact that [Mother] and [Mr. V.] were manufacturing methamphetamine[] while living at 1180 Benton Pike. . . ."

Following our review of the entire record, we must agree with Mother that there is no evidence before us that methamphetamine was being "created" or manufactured in the home she shared with the Children. Without a doubt, methamphetamine was present in the home. It was being used in the home and sold out of the home. It is certainly possible, perhaps probable, that it was made at the home. Neither this possibility nor the evidence presented at trial, however, satisfies the clear and convincing standard of evidence necessary to support a finding of severe child abuse. Likewise, the Child's testimony that Mother and Mr. V were outside "mixing things in a coke bottle" does not constitute evidence of the manufacture of methamphetamine. In turn, there is no other evidence before us to support a finding of severe child abuse against Mother for "knowingly allow[ing] both [C]hildren to be present within her house where methamphetamine was being created and sold." See Tenn. Code Ann. § 37-1-102(23)(D). Accordingly, this ground for termination of Mother's rights has not been shown by clear and convincing evidence and is therefore vacated.

VII.

Having concluded that there is a ground for terminating each of the parents' parental rights, we next consider whether the trial court's termination decision is in the best interest

-22-

of the Children.  We are guided in our review by the relevant statutory factors set forth in Tenn. Code Ann. § 36-1-113(c).[7]

On its consideration of the applicable factors, the trial court concluded that there was clear and convincing evidence that termination of both parents' rights is in the best interest

[7]The factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

of the Children. The court found that "both [Mother] and [Father] have failed to successfully address the conditions that led to the removal of the [C]hildren from them;" that neither had maintained regular visitation with either child, (although Father had made efforts to visit Trinity); "there is no longer a meaningful relationship between Austin . . . and his parents, and the relationship between Trinity and Father was "strained;" there was "some degree of doubt" of the status of Father's current home environment; "insufficient evidence to show that [Mother] has rehabilitated from her long history of drug abuse at the time of trial. . . .;" and both parents had a "history of significant child support arrearages." *See* Tenn. Code Ann. 36-1-113.

We quote pertinent portions of the court's consideration of the remaining factors as follows:

> Both [Children] have adjusted well to residing with [Grandmother]. [Austin's] grades at school have improved significantly . . . . Trinity [] has been successful at school as well. Proof was offered . . that both [C]hildren have received numerous awards related to their academic successes . . . . Both [C]hildren are happy and well-adjusted with [Grandmother]. To take the [C]hildren from [Grandmother's] home where they are thriving would inevitably lead to causing [the Children] to suffer an emotional and potentially psychological crisis. This factor demonstrates that such a transition would not be in the best interests of either [Child].

> \* \* \*

> [T]he family history of these [C]hildren while they were in [Father's] custody can only be stated as tumultuous at best. Substantial proof of [Father's] temper and anger issues toward [Mother] was presented at trial. This included proof that [Father] was arrested in 2008 for domestic assault perpetrated against [Mother]. Austin['s] testimony collaborated with the report of the officer who investigated that incident. Even while [Father] was on the witness stand he denied that he had any issued with controlling his anger. [Father's] anger issues and his apparent respect for authority as demonstrated by his failure to follow court orders and/or to pay his taxes preponderates against the best interests of the [C]hildren in this case.

> It is not in the best interests of [the Children] to be returned to [Mother]. On the contrary, it is in their best interests to remain with [Grandmother], who had provided them with a stable and drug-free home environment.

* * *

> The precise nature of the physical environment of [Father's] home, where [Mother] is allegedly residing at the time of trial, is uncertain. [. . . .]. [A]t least some degree of doubt was generated . . . as to whether [Father] actually resides at the residence that he testified was his. This is due to a recent pay stub from his current employer which reflects a different address and [Father's] inability to produce a signed land contract or other agreement.

> [Mother's] diary shows proof that [Father] has been engaged in drug-related activity with [Mother], although [Father] strongly refuted this allegation. [. . . .]. There is insufficient evidence to show that [Mother] has rehabilitated from her long history of drug abuse at the time of trial. Although such rehabilitation could bring about a much needed change in [Mother's] life, she had not made the efforts to rehabilitate herself. This factor indicates that it is in the best interest of [the Children] to remain in the care of [Grandmother].

At trial, the proof additionally showed that Grandmother had repeatedly and selflessly stepped forward when neither parent was able to care for the Children as a result of their poor personal choices. At trial, Mother agreed that, initially, Grandmother believed in her and supported her and the Children when she, Mother, made an effort at drug rehabilitation. Indeed, the record indicates that Grandmother gave both Mother and Father every opportunity to address the issues that had caused them to be separated from the Children before she sought permanent custody. Mother's efforts were clearly unsuccessful as the proof showed that she continued to use drugs after she completed an out-patient drug program and after the Children were removed from her custody. As the trial court emphasized, there was no basis for concluding that Father had sufficiently resolved his anger issues since he waited until the termination trial was set to begin before managing to complete an on-line anger management course.

On the other hand, Grandmother had given up her long-held trucking business, changed careers and moved homes in order to be more available to the Children and to provide them a with a comfortable, stable home. Grandmother loved and supported the Children, took them to and from school each day, tutored them in their school work, and got them to their scheduled doctors appointments and the counseling sessions that she had arranged – all things a parent is expected to do for their Children. The Children had make significant improvement in their school performance, were by all indications happy and healthy, and enjoyed school, their friends, and their life with Grandmother. In our view, there is clear and convincing evidence to support the trial court's determination that terminating Mother's and Father's parental rights is in the best interest of the Children.

## VIII.

The judgment of the trial court is vacated in part and affirmed in part. Costs on appeal are taxed to the appellants, Nicole D. and Terry D. This case is remanded to the trial court, pursuant to applicable law, for enforcement of that court's judgment and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE